A08A1029. T & G ENTERPRISES, LLC v. WHITE.
(680 SE2d 196)

ADAMS, Judge.

On March 18, 2005, T & G Enterprises, LLC conveyed Lot 70 of the Freeway Subdivision in Whitfield County to Jeffrey A. White. White subsequently sued T & G, asking that the court enter a decree of specific performance requiring that T & G convey Lot 77 to White, or so much thereof as the court deemed appropriate. In the alterna-

---

tive, White asserted a claim for breach of contract. Following a bench trial, the trial court awarded White title to a portion of Lot 77. T & G appeals. Because the contract White sought to enforce is too vague to authorize the remedy of specific performance, we reverse.

"The court is the trier of fact in a bench trial, and its findings will be upheld on appeal if there is any evidence to support them. The plain legal error standard of review applies where the appellate court determines that the issue was of law, not fact." (Punctuation and footnotes omitted.) *Page v. Braddy*, 255 Ga. App. 124, 126 (564 SE2d 538) (2002). So viewed, the evidence shows that while viewing real estate sites on her computer, White's spouse saw a listing for a residence located at 435 Sagamore Drive in Tunnel Hill. According to the listing, the property was located on lots 70 and 77 in the Freeway Subdivision, and the lot size was "0 to ½ acre." She contacted the designated agent, Susan Toney, and set up an appointment to look at the property.

White and his wife met with Toney and inspected the house. In the basement there was a blue box with a wire going into it, marked "Well." Ms. White asked Toney if the house was supplied by well water and indicated that, if so, they would not be interested in the property. Toney responded that there was a well but that the house had been switched over to city water.[1]

After looking at the basement, the Whites and Toney went outside, and White asked Toney to identify the property boundaries. According to Ms. White, Toney "couldn't tell us specifically how the line ran," but Toney agreed with the Whites that the property appeared to encompass more than a half acre, and stated that the acreage in the computer listing was probably an "error typo." White then began looking for the well. He located the well house in an area overgrown with high weeds south of the house, and midway between the house and a mobile home.

Referring to the overgrown area, Toney represented "[t]hat'd be your other lot right there." Based on the listing, their observations, and Toney's statements, White and his wife concluded that the property offered for sale included two lots: (i) the house and the maintained area around the house, and (ii) the overgrown area where the well was located. White told Toney that he would like to offer $117,000 for the property.

Later that same day, White and his wife went to Toney's offices to sign a purchase and sale agreement which Toney had prepared ("Contract I"), dated February 12, 2005. White tendered $500 in earnest money and signed Contract I, as the buyer, for property

---

[1] White does not contend that Toney was mistaken about the city water.

located at 435 Sagamore Drive, and "being more particularly described as Lot 70 77 . . . of Freeway Subdivision, as recorded in Plat Book 3724, Page 087, Whitfield County, Georgia." T & G was listed as the seller. According to the agreement, its terms constituted an offer by White open to acceptance until February 14, 2005. Toney called White the following Monday and informed him that the owner had declined his offer.

White decided to make another offer to match the price that T & G's principal, Gary Gazaway, had demanded, and so Toney prepared another document ("Contract II"), which White signed. Contract II was identical to Contract I, except for the date, February 14, 2005, the purchase price, which was $119,900, and the time it was open for acceptance, which was extended to February 15, 2005. Toney subsequently informed White that T & G had agreed to Contract II, but there is no evidence that it was actually executed on behalf of T & G.

The parties subsequently agreed to change the purchase price to $123,497. According to White, he agreed to the change in the purchase price but he never saw the third contract ("Contract III"), which also contained a handwritten, uninitialed stipulation that "Portion of property to be sold is portion containing house," until a month after the closing, and he never signed the document. Unknown to White, Toney inserted White's signature page from Contract II into Contract III, and then sent it to the mortgage lender. The signature page on Contract III is signed by Gazaway on behalf of T & G, and indicates that the offer was accepted on February 15, 2005. As with Contract I and Contract II, Contract III provides that the property to be sold included Lots 70 and 77.

A fourth version of the contract ("Contract IV") was attached to T & G's answer. According to White, he never saw Contract IV until the answer was filed. Contract IV differs from Contract III in that the lot numbers are crossed through by hand with the notation "SREM," apparently a reference to the handwritten stipulation. At the closing on March 18, 2005, T & G conveyed Freeway Subdivision Lot 70 to Jeffrey A. White by warranty deed.

Several months after closing, White decided to have his property surveyed. He told the surveyor that he had bought Lots 70 and 77. The surveyor reviewed White's deed at the courthouse and determined that White did not own Lot 77, and so he surveyed Lot 70. At the request of White's attorney, the surveyor later surveyed Lot 77. The surveys, the subdivision plat, and other evidence introduced at trial showed that White's house was located on Lot 70, a rectangular tract containing 1.15 acres; the well, a portion of the overgrown area, and the mobile home were located on Lot 77, a rectangular tract also containing 1.15 acres.

At the request of White's attorney, the surveyor subsequently drew a line dividing Lot 77 into Parcel A and Parcel B based on his viewing of the property and his conversations with White and White's attorney. According to the surveyor, Parcel A, which contained the well, had been "awful growed up when we did Lot 70," and "this is what [White] thought he was getting." White then commissioned an appraisal of Lot 77 and Parcel A, which the appraiser determined to have an estimated fair market value of $21,500 and $6,200, respectively. Following the bench trial, the trial court awarded White title to Parcel A, as it was described in the appraisal.

1. White sued T & G for specific performance of Contract III.[2] T & G argues that White was not entitled to specific performance of Contract III because it is an antecedent real estate sale contract which merged into the deed upon closing and was also too indefinite to support the award. Pretermitting the issue of merger, and assuming that Contract III is otherwise enforceable against T & G, we agree with T & G that the agreement did not contain a sufficiently definite identification of the land to be sold to authorize the remedy of specific performance.

Contract III contemplated that White buy, and that T & G sell, property known as 435 Sagamore Drive, "more particularly described as Lot 70 77 . . . of Freeway Subdivision," as recorded in the Whitfield County records. The agreement contains a handwritten stipulation that "Portion of property to be sold is portion containing house."

> A court of equity will not decree the specific performance of a contract for the sale of land unless there is a definite and specific statement of the terms of the contract. The contract must identify the land to be sold with reasonable definiteness by describing the particular tract or furnishing a key by which it may be located with the aid of extrinsic evidence. Because a decree for specific performance operates as a deed, the description in the decree should be as definite as that required for a deed. Where land is so vaguely described that the writing provides no key to its identification, specific performance will not be decreed.

(Citations and punctuation omitted.) *Scheinfeld v. Murray*, 267 Ga. 622, 623 (1) (481 SE2d 194) (1997).

---

[2] During the trial, White maintained that, notwithstanding the alleged unauthorized assertion of his signature page from Contract II into the document, he had ratified Contract III. As expressed by his attorney, "Mr. White is stating that he is bound by this contract."

Absent the special stipulation, Contract III appears to identify the property to be sold as including two lots within the Freeway Subdivision. White argues that the special stipulation, "[p]ortion of property to be sold is portion containing house," showed that the parties intended to transfer something less than both Lot 70 and Lot 77, and that the trial court's order was consistent with that intent. White further maintains that Contract III contained a "key" to the property to be sold through its reference to Lot 70 and Lot 77, allowing the trial court to determine the exact boundaries through aid of extrinsic evidence. A key, however, "must lead to the establishment and the location of boundaries as of the time of the execution of the conveyance." *Laurens County Bd. of Ed. v. Stanley*, 187 Ga. 389, 390 (200 SE 294) (1938). Although the property intended to be conveyed had to lie within either Lot 70 or Lot 77, or both, the reference to these lots neither establishes nor provides a key to establishing the actual location of the boundaries of the property to be conveyed. See id. Further, it is impossible to determine those boundaries by reliance on the provision that only the "portion containing house" is to be sold absent a finding, apparently rejected by the trial court, that the parties intended that either Lot 70 *or* Lot 77 be sold, depending on which lot actually contained the house. Nor does Contract III provide a description of or a key to the property actually awarded by the trial court, which consisted of lands identified through an admittedly artificial line in a post-closing survey. Compare *Kauka Farms, Inc. v. Scott*, 256 Ga. 642, 645 (1) (352 SE2d 373) (1987) (description sufficient as it was "clear on its face as to size, shape, and location"). Since the "land is so vaguely described that the writing provides no key to its identification," *Scheinfeld*, 267 Ga. at 623 (1), the trial court was not authorized to award specific performance of Contract III.

2. T & G further contends that the trial court's order cannot be sustained as a reformation of the contract between the parties. We agree, although not for the reasons suggested by T & G. Rather, this theory of recovery was never before the trial court. In his complaint, White asserted claims for specific performance and, in the alternative, breach of contract. The pre-trial order is consistent with the complaint and does not contemplate reformation of the deed or any other instrument or agreement, and White never sought an amendment of the order. During opening argument, White's counsel maintained that White's contentions were reflected in the pre-trial order and he was seeking to enforce a binding contract. After the presentation of evidence, White's counsel asked for specific performance of the contract or damages in the alternative.

"If a claim or issue is omitted from the [pre-trial] order, it is waived." (Citations and punctuation omitted.) *Dunaway v. Parker*,

215 Ga. App. 841, 845 (1) (453 SE2d 43) (1994). The pre-trial order may be deemed modified during trial under certain circumstances, including to conform to evidence admitted at trial without objection. *Dept. of Human Resources v. Phillips*, 268 Ga. 316, 319 (1) (486 SE2d 851) (1997). However, even if the trial court might have considered the issues to have been expanded beyond the pre-trial order to include reformation, there is no indication in its final order that it did so. Compare *L. S. Land Co. v. Burns*, 275 Ga. 454, 455-456 (1) (569 SE2d 527) (2002) (theory of reformation was before the trial court as complainant made a pre-trial motion to amend pleadings to seek reformation of the contract, and, in oral ruling, trial court referred to reformation of contracts). The final order does not mention reformation and its award of Parcel A reflected the property specifically sought by White at trial in its request for an award of specific performance. Accordingly, we will not consider whether if the trial court had reformed the deed or a contract between the parties, the evidence would have authorized such a remedy.

*Judgment reversed. Blackburn, P. J., and Doyle, J., concur.*

DECIDED JUNE 16, 2009.

*Waycaster, Morris & Dean, Jeffrey J. Dean*, for appellant.

*McCamy, Phillips, Tuggle & Fordham, Charles L. Daniel III*, for appellee.