**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 14, 2021**

# In the Court of Appeals of Georgia

A21A0922, A21A0923. SPI HOLDCO, LLC, et al v. MOOKERJI; and vice versa.

DILLARD, Presiding Judge.

In Case No. A21A0922, SPI Holdco, LLC and Software Paradigms International Group, LLC[1] appeal the trial court's judgment, awarding Siddhartha Mookerji—SPIG and SPI Holdco's former global chief executive officer—employment incentive payments totaling $5,400,000 and a Tesla of his choosing. Specifically, these defendants argue that the trial court (1) applied the wrong methodology in determining the amount of incentive payments Mookerji was entitled to receive under the employment agreement and related documents; (2)

---

[1] For ease of reference, SPI Holdco, LLC will be referred to as "SPI Holdco" and Software Paradigms International Group, LLC will be referred to as "SPIG." We will also collectively refer to these parties as "the defendants."

ignored its own findings that there was no meeting of the minds as to the essential elements of the contract provisions at issue; and (3) erroneously concluded that Mookerji is entitled to a Tesla under the employment agreement.

In Case No. A21A0923, Mookerji's cross appeal, he contends that the trial court erred by denying his pretrial motion for summary judgment and granting, in part, the defendants' motion for same. Specifically, Mookerji argues that the trial court (1) erred in granting summary judgment to the defendants as to his claim that they owed him a $1,000,000 severance payment under his employment agreement; and (2) abused its discretion in denying his motion to amend the pretrial order to add a claim that the defendants owed him 30 days' salary. For the reasons set forth *infra*, we affirm in both cases.[2]

*Case No. A21A0922 - The Bench Trial*

Viewing the evidence in the light most favorable to the trial court's judgment,[3] the record shows that, in 1994, Mookerji and his wife founded Software Paradigms

---

[2] Oral argument was held in this case on May 5, 2021, and is currently archived on the Court's website. See Court of Appeals of Georgia, Oral Argument, Case Nos. A21A0922, A21A0923 (May 5, 2021), available at https://www.gaappeals.us/oav/A21A0922-0923.php.

[3] *See, e.g.*, *Sitterli v. Csachi*, 344 Ga. App. 671, 671 (811 SE2d 454) (2018).

International, Inc. and were the company's first two employees. In the years that followed, this business grew into a multi-national, information technology services and solutions provider for retailers around the globe. Then, on May 14, 2015, Mookerji formed SPI Holdco for the purpose of selling an interest in SPIG—one of its subsidiaries—to Tower Arch Capital, a private equity investor.[4]

On May 15, 2015, Mookerji entered into a three-year written employment agreement with SPI Holdco and SPIG to serve as their global chief executive officer. It is undisputed that Mookerji was not involved in negotiating the employment agreement, but instead, authorized Thomas Delbrook—his company's chief financial officer—to negotiate the terms of the contract with two Tower Arch corporate representatives, Rhett Neuenschwander and David Topham. Thereafter, on May 22, 2015, Tower Arch purchased a controlling interest in SPI Holdco. And on the same day, Mookerji signed SPI Holdco's operating agreement (the "2015 operating agreement"). In addition to his employment, Mookerji maintained an approximately 48 percent ownership interest in SPI Holdco. And while the term of employment provided for in the employment agreement expired in May 2017, the defendants

_____

[4] For ease of reference, Tower Arch Capital will be referred to as "Tower Arch" throughout this opinion.

terminated Mookerji's employment early on September 8, 2016. It is undisputed that this termination was without cause.

Thereafter, on November 23, 2016, Mookerji filed a complaint against the defendants, alleging claims for breach of contract, breach of implied covenant of good faith and fair dealing, and attorney fees. Specifically, Mookerji contended that his termination violated the employment agreement because it occurred prior to the expiration of the term set forth in the agreement *and* it was done without cause or proper notice. Mookerji also alleged that SPIG and SPI Holdco failed to pay him certain incentive compensation and other benefits—including a Tesla of his choosing—that he is owed under his employment agreement.

Discovery ensued, and the parties eventually proceeded to a bench trial.[5] Following trial, the court issued a detailed and thorough final judgment, finding, in relevant part, that (1) under Section 3.3 of the employment agreement, Mookerji was

[5] Prior to trial, the parties filed cross-motions for summary judgment and Mookerji filed a motion for judgment on the pleadings. On February 28, 2020, following trial, the trial court entered its final judgment and order, as well as an order on the foregoing motions. While the court did not *issue* its summary judgment order prior to trial, the court's final judgment noted that the defendants were entitled to summary judgment as to Mookerji's claim for $1,000,000 in severance pay and for breach of implied covenant of good faith and fair dealing. These claims will be addressed below in Case No. A21A0923, Mookerji's appeal from the trial court's summary-judgment order.

4

entitled to $5,400,000 in incentive payments for the years 2015 and 2016; (2) he was entitled to a Tesla of his choosing under Section 3.4 of the agreement; but (3) he was not entitled to attorney fees and litigation expenses. This appeal follows.

In reviewing a bench trial, we view the evidence in "the light most favorable to the trial court's rulings, defer to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous."[6] Indeed, the court is the trier of fact in a bench trial, and "its findings will be upheld on appeal if there is any evidence to support them."[7] Bearing these guiding principles in mind, we turn to the defendants' specific claims of error.

1. In their first two claims of error, the defendants argue that the trial court erred in concluding that the methodology used to calculate "Adjusted EBITDA"[8]—defined *infra*—for purposes of Section 3.3 of the employment

---

[6] *Sitterli*, 344 Ga. App. at 671 (punctuation omitted); *accord Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017).

[7] *Manigo v. Johnson*, 241 Ga. App. 676, 676 (527 SE2d 282) (1999) (punctuation omitted); *see Bloomfield v. Bloomfield*, 282 Ga. 108, 108 (1) (646 SE2d 207) (2007) ("[T]he standard by which findings of fact are reviewed is the 'any evidence' rule, under which a finding by the trial court supported by any evidence must be upheld." (punctuation omitted)).

[8] EBITDA is an abbreviation commonly used for "earnings before interest, taxes, and depreciation and amortization," which includes "[a] company's income

agreement includes revenue attributable to acquisitions SPI Holdco made *after* that agreement was executed in May 2015 ("future acquisitions"). They further contend that, relying on this improper method, the court erroneously awarded Mookerji $5,400,000 in incentive payments provided for in Section 3.3. Finally, they argue that the trial court also erred in ignoring its own finding that there was no meeting of the minds between the parties as to the conditions under which Mookerji would receive such payments. We disagree.

It is well established that the construction of a contract is "a question of law for the court,"[9] involving three analytical steps:

> The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what

---

without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." Earnings, BLACK'S LAW DICTIONARY (11th ed. 2019).

[9] *Copeland v. Home Grown Music, Inc.*, 358 Ga. App. 743, 748 (1) (856 SE2d 325) (2021) (punctuation omitted); *accord Shields v. RDM, LLC*, 355 Ga. App. 409, 413 (1) (844 SE2d 297) (2020).

the parties intended must be resolved by a jury [or the trial court at a bench trial].[10]

Significantly, the cardinal rule of contract construction is "to ascertain the intention of the parties, *as set out in the language of the contract.*"[11] And when the language of the agreement is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve that ambiguity and ascertain the intent of the parties.[12] Significantly, when the language of a contract is plain and unambiguous, "judicial construction is not only unnecessary but forbidden."[13]

Turning to the provision at issue, Section 3.3 of Mookerji's employment agreement provides that he would receive an

---

[10] *Copeland*, 358 Ga. App. at 748 (1) (punctuation omitted); *accord Shields*, 355 Ga. App. at 413 (1); *Stanley v. Gov't Emps. Ins. Co.*, 344 Ga. App. 342, 344 (1) (810 SE2d 179) (2018).

[11] *Copeland*, 358 Ga. App. at 748 (1) (punctuation omitted and emphasis supplied); *accord Shields*, 355 Ga. App. at 413 (1).

[12] *See Yash Sols., LLC v. New York Glob. Consultants Corp.*, 352 Ga. App. 127, 140 (834 SE2d 126) (2019); *Board of Comm'rs of Crisp Cty. v. City Comm'rs of City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012).

[13] *Fid. & Deposit Co. of Maryland v. Lafarge Bldg. Materials, Inc.*, 312 Ga. App. 821, 823 (720 SE2d 288) (2011) (punctuation omitted); *accord Abdulkadir v. State*, 279 Ga. 122, 123 (2) (610 SE2d 50) (2005).

additional TEV incentive payment of 0.5% of [*SPI Holdco's*] Total Enterprise Value ("TEV") determined at the time of any Sale of the [SPI Holdco] which shall be earned for *each year* that [*SPI Holdco*] meets or exceeds the Adjusted EBITDA number for such year as presented to the lender in the Agent Presentation being, more specifically,

Adjusted EBITDA 2015 = $18.0 million
Adjusted EBITDA 2016 = $22.4 million
Adjusted EBITDA 2017 = $26.5 million

which TEV incentive payment in total shall not exceed one and one-half percent (1.5%) of the TEV at the time of any Sale of the [SPI Holdco]. The TEV incentive payment shall be payable to Executive by [SPI Holdco] upon a Sale of [SPI Holdco]. For purposes of the foregoing, "Adjusted EBITDA" and "Agent Presentation" shall have the meanings assigned to such terms in [SPI Holdco's] Amended and Restated Operating Agreement of even date herewith ("[SPI Holdco's 2015] Operating agreement").[14]

And "Company" is specifically defined as SPI Holdco at the outset of the employment agreement.[15] Furthermore, the 2015 operating agreement referred to in Section 3.3 contains the following definitions:

"*Adjusted EBITDA*" shall mean[ ], at any date of determination, an amount equal to the *consolidated net income or loss of [SPI Holdco] and its Subsidiaries* plus the following to the extent deducted in calculating such *consolidated net income or loss* (without duplication):

---

[14] (Emphasis supplied).

[15] For the sake of clarity, given that "Company" is defined as SPI Holdco and multiple companies are involved in this case, SPI Holdco will replace the word Company when we quote the contract terms at issue.

(a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest), in each case to the extent treated as interest in accordance with GAAP, (b) the provision for federal, state, local and foreign income taxes payable, and (c) depreciation and amortization expense, as adjusted consistent with the methodology used to calculate "Adjusted EBITDA" in the management projections set forth in the Agent Presentation.[16]

"Agent Presentation" means that certain Management Presentation to Lenders, dated as of April 21, 2015, presented on behalf of [SPI Holdco] and its Subsidiaries to Agent on or about April 21, 2015.

In 2018, SPI Holdco was sold for $540,000,000, which is when Mookerji was entitled to receive incentive compensation, if any, that he earned while employed by SPI Holdco under Section 3.3. Specifically, Mookerji is entitled to incentive payments for each year SPI Holdco met or exceeded the Adjusted EBITDA bench marks set forth in Section 3.3 and the agent presentation.[17]

---

[16] (Emphasis supplied).

[17] According to the trial court, the parties agreed that the Adjusted EBITDA numbers listed in Section 3.3 were "lifted" from page 61 of the agent presentation, except that they were "rounded." And in fact, the Adjusted EBITDA numbers listed for 2015, 2016, and 2017 are identical to those provided for in the agent presentation, except for a small difference for 2016. Regardless, as explained more fully *infra*, the parties do not dispute the amount of the *projected* Adjusted EBITDA numbers for

Significantly, the parties stipulated to the following:

> If revenue attributable to businesses acquired by [SPI Holdco] *is counted* in calculating its Adjusted EBITDA, the thresholds for Mr. Mookerji to receive incentive compensation as described in Section 3.3 *would have been met* for years 2015 and 2016.

> If, however, revenue attributable to businesses acquired by [SPI Holdco] *is not counted* in calculating its Adjusted EBITDA, the thresholds for Mr. Mookerji to receive incentive compensation as described in Section 3.3 *would not have been met* for years 2015 and 2016.[18]

The trial court—after considering the plain language of the relevant contract provisions, as well as testimony and other evidence presented at trial—found that revenue attributable to acquisitions made by SPI Holdco after May 2015 was to be

---

each year, but instead, they disagree as to the method by which SPI Holdco's *actual* Adjusted EBITDA is calculated for each year for purposes of determining whether SPI Holdco met or exceeded the projected amounts—*i.e.*, whether it includes revenue attributable to SPI Holdco's future acquisitions.

[18] (Emphasis supplied). The parties agree Mookerji is not entitled to any incentive payments for 2017, even though Section 3.3 included a projected Adjusted EBITDA for that year, because his employment was terminated in 2016.

included in calculating SPI Holdco's Adjusted EBITDA for 2015 and 2016. As a result, it awarded Mookerji $5,400,000 in incentive payments.[19]

In its order, the trial court found that those who negotiated the employment agreement—Delbrook on behalf of Mookerji; and Neuenschwander and Topham on behalf of Tower Arch—failed "to clearly articulate in the language of the contract that future acquisitions would not be included [in calculating SPI Holdco's Adjusted EBITDA]," thus creating "an ambiguity in Section 3.3 [of the employment agreement]." As a result, the trial court considered evidence other than the plain language of the agreement and related documents in order to determine the intent of the parties in this regard. For example, although the court noted that Delbrook, Neuenschwander, and Topham all testified that their understanding and intent in drafting Section 3.3 was that future acquisitions would be excluded, it also found that

---

[19] We reiterate that our only task in reviewing the trial court's factual findings is to determine whether there was *any* evidence to support them. *See Bloomfield v. Bloomfield*, 282 Ga. 108, 108 (1) (646 SE2d 207) (2007) ("[T]he standard by which findings of fact are reviewed is the 'any evidence' rule, under which a finding by the trial court supported by any evidence must be upheld." (punctuation omitted)); *Page v. Braddy*, 255 Ga. App. 124, 126 (564 SE2d 538) (2002) ("The court is the trier of fact in a bench trial, and its findings will be upheld on appeal if there is any evidence to support them."); *T & G Enterprises, LLC v. White*, 298 Ga. App. 355, 356 (680 SE2d 196) (2009) (same); *Sheppard v. Sheppard*, 229 Ga. App. 494, 495 (2) (494 SE2d 240) (1997) (same).

11

they never discussed this understanding with Mookerji prior to August 2016. Further, the court found that relying on the negotiators' self-serving testimony would essentially require it to revise the provision at issue. Indeed, the relevant evidence shows that each of the negotiators—including Delbrook—stood to gain financially if Mookerji did not receive the incentive payments at issue. The court also discredited the testimony of the defendants' expert that it would not be standard or customary to include future acquisitions in this type of incentive provision because, on cross-examination, he could not "reference a single document, book, textbook, treatise, or journal article" to support this assertion. Needless to say, we are required to defer to the these findings so long as they are not clearly erroneous, but we apply "a de novo standard of review to any questions of law decided by the trial court."[20] And

---

[20] *Najarian Cap., LLC v. Milford*, 357 Ga. App. 174, 175 (850 SE2d 236) (2020) (punctuation omitted); *see ALA Constr. Servs., LLC v. Controlled Access, Inc.*, 351 Ga. App. 841, 841-42 (833 SE2d 570) (2019) ("We apply a de novo standard of review to any questions of law decided by the trial court; factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." (punctuation omitted)).

importantly, the "existence or nonexistence of ambiguity in a contract is a question of law for the court."[21]

Here, we agree with the trial court that adopting the defendants' interpretation of Section 3.3 would essentially require us to go beyond construing that provision and *revise* it. That said, we part ways with the trial court's assessment that this provision is ambiguous as a matter of law. Indeed, it is of no consequence that neither Section 3.3 nor the applicable definition of Adjusted EBITDA specify that *any* particular types of SPI Holdco revenue be *excluded* from the relevant calculations, much less one that explicitly excludes SPI Holdco's future acquisitions. As previously mentioned, if the language of a contract is plain and unambiguous, "judicial construction is not only unnecessary but it is *forbidden*."[22] So, in the absence of "words *of limitation*, words in a [contract] should be given their ordinary and

---

[21] *Coleman v. Arrington Auto Sales & Rentals*, 294 Ga. App. 247, 249 (2) (669 SE2d 414) (2008).

[22] *Fid. & Deposit Co. of Maryland*, 312 Ga. App. at 823 (punctuation omitted and emphasis supplied); *accord Abdulkadir*, 279 Ga. at 123 (2); *Six Flags Over Ga. v. Kull*, 276 Ga. 210, 211 (576 SE2d 880) (2003); *Bibler Masonry Contractors, Inc. v. J. T. Turner Constr. Co., Inc.*, 340 Ga. App. 490, 492 (798 SE2d 19) (2017).

everyday meaning."[23] It is the function of this Court to "construe the contract *as written* and not to make a new contract for the parties."[24] But the trial court went beyond construing the language of the relevant provisions and also considered evidence presented at trial, even though "parol evidence is inadmissible to *add to*, take from, or vary a written contract . . . ."[25]

In this case, the entire dispute is over whether to include future acquisitions as part of SPI Holdco's income when calculating its Adjusted EBITDA and that issue is determinative of whether Mookerji is entitled to the incentive compensation he seeks. And as detailed *supra*, Section 3.3 broadly provides that Mookerji was to receive a TEV incentive payment of 0.5 percent of *SPI Holdco's* TEV determined at the time the company was sold, and the payment is earned for each year *SPI Holdco* meets or exceeds the projected Adjusted EBITDA number. But as previously noted,

---

[23] *Kull*, 276 Ga. at 211 (punctuation omitted and emphasis supplied); *accord Seals v. Hygrade Distribution & Delivery Sys., Inc.*, 249 Ga. App. 574, 576-77 (549 SE2d 412) (2001).

[24] *Rec. Town, Inc. v. Sugarloaf Mills Ltd. P'ship of Ga.*, 301 Ga. App. 367, 370 (687 SE2d 640) (2009) (punctuation omitted and emphasis supplied); *Roquemore v. Burgess*, 281 Ga. 593, 595 (642 SE2d 41) (2007).

[25] *Shepherd v. Greer, Klosic & Daugherty*, 325 Ga. App. 188, 192 (750 SE2d 463) (2013) (punctuation omitted and emphasis supplied); *accord John Deere Co. v. Haralson*, 278 Ga. 192, 194 (599 SE2d 164) (2004).

14

Section 3.3 does not include *any* exclusions from the type of revenue to be considered in calculating that number. Furthermore, Adjusted EBITDA is defined in the 2015 operating agreement as "an amount equal to the *consolidated net income or loss of SPI Holdco and its Subsidiaries*,"[26] subject to various enumerated deductions "in calculating such net income or loss." So, unlike these specified deductions from SPI Holdco's income and losses, revenue attributable to future acquisitions is *not* enumerated as such a deduction in the definition of Adjusted EBITDA. As a result, under the maxim "expressio unius est exclusio alterius"—which means "the express mention of one thing implies the exclusion of the other"—income attributable to future acquisitions is presumed to be *included* in determining SPI Holdco's income for the purpose of calculating EBITDA.[27]

---

[26] (Emphasis supplied).

[27] *Expressio unis est exclusio alterius* is a "well-known principle of construction" that means "the express mention of one thing implies the exclusion of another, which, in turn, requires [this Court] to conclude that such omission was intentional." *Copeland*, 358 Ga. App. at 749 (1) (856 SE2d 325, 331) (punctuation and footnote omitted). *See H&E Innovation, LLC v. Shinhan Bank of Am.*, 343 Ga. App. 881, 886-87 (1) (808 SE2d 258) (2017) (holding that under the canon "expressio unius est, exclusio alterius," a contract stating that "the first mortgage on subject property remains intact," necessarily implies that the second mortgage on the same property would not remain intact, that is, would be released); *Miller Cty. Bd. of Educ. v. McIntosh*, 326 Ga. App. 408, 408 (1) (756 SE2d 641) (2014) (applying the canon "expressio unius est, exclusio alterius" to conclude that in construing an employment

In short, had the parties wished to *exclude* revenue attributable to future acquisitions from SPI Holdco's income for purposes of calculating the company's Adjusted EBITDA, they easily could have done so expressly in Section 3.3 *or* in the 2015 operating agreement. Indeed, if we were to adopt the defendants' construction of Section 3.3, nearly every contract provision could be considered ambiguous for not including or addressing a particular matter. The defendants are essentially asking us to *create* or *add* an exception out of whole cloth to the type of SPI Holdco's revenue to be included in calculating the company's Adjusted EBITDA that has no basis in the plain language of Section 3.3 or any of the related documents. This, we cannot do.[28] In sum, while we reject the trial court's conclusion that Section 3.3 is

contract a comparison of the express requirements of the written statement of charges by the board versus the employee's obligation to merely set forth his "contentions" in response thereto indicates that the parties did not intend to place an equivalent explanatory burden on employee as to the contents of his reply); *George L. Smith II Ga. World Congress Ctr. Auth. v. Soft Comdex, Inc.*, 250 Ga. App. 461, 464 (1) (b) (550 SE2d 704) (2001) (holding that under the maxim "expressio unius est exclusio alterius," the list of "Facilities Licensed" in the contract is presumed to exclude any facility not specifically listed).

[28] *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 794 (1) (546 SE2d 781) (2001) ("It has long been the law of this State that the parol evidence rule prohibits the consideration of evidence of a prior or contemporaneous oral agreement to alter, vary or change the unambiguous terms of a written contract." (punctuation omitted)); *City of Demorest v. Roberts & Dunahoo Props., LLC*, 288 Ga. App. 708, 712 (1) (655 SE2d 617) (2007) (holding that a party's claims were barred when the relevant

16

ambiguous, the plain language of the documents at issue supports its ultimate ruling

that *all* SPI Holdco revenue is to be included in determining the incentive payment

owed to Mookerji, as well as its accompanying award of $5,400,000.[29]

contract stated that it was the final disposition of all disputes and that party "did not reserve any claims" to be omitted from that agreement); *Speed v. Muhanna*, 274 Ga. App. 899, 905(2) (b) (619 SE2d 324) (2005) ("Where the terms of a written contract are clear and unambiguous, the court will look to the contract *alone* to find the intention of the parties. Such a contract is the *only evidence* of what the parties intended and understood by it. Parol evidence is not admissible to contradict or construe an unambiguous contract." (punctuation omitted and emphasis supplied)); *Anderson v. Astro Exterminating Servs., Inc*., 259 Ga. App. 370, 370 (577 SE2d 67) (2003) ( "When the language of an agreement is plain and unambiguous, the court must afford its literal meaning, *despite a party's contention that he understood the contract to mean something else*." (punctuation omitted and emphasis supplied)); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: *The Interpretation of Legal Texts* 93 (2012) ("It is not [the judge's] function or within his power to enlarge or improve or change the law. Nor should the judge elaborate unprovided-for exceptions to a text [because] . . . if the [the parties had] intended to provide additional exceptions, [they] would have done so in clear language.") (citations omitted)).

[29] The defendants' arguments on appeal regarding the construction of Section 3.3 are all based on the presumption that the language of the relevant documents is ambiguous, such that evidence outside the language of the contract can be considered to determine the parties' intent regarding future acquisitions. But because we conclude that Section 3.3 is *unambiguous*, we need not address those arguments. Even so, the defendants are correct that the trial court erred in finding that any ambiguity in the contract language must be construed against them as the drafter. Indeed, Section 18 of the employment agreement provides that the agreement was negotiated and should not be construed in favor of or against either party. But because the employment agreement is not ambiguous, it is irrelevant that the trial court erred in this regard. Lastly, although the trial court found Section 3.3 of the employment contract ambiguous, "[u]nder the 'right for any reason' rule, an appellate court will

17

Finally, the defendants briefly argue, in passing, that the trial court erred in not considering the "obvious mutual mistake" in Section 3.3 regarding the parties' intent to exclude future acquisitions from the pertinent calculations. But the trial court did not address a mutual-mistake argument in its lengthy and detailed order, so there is nothing in that order suggesting that it implicitly ruled on such a claim. And more importantly, the parties never raised this issue at trial or in the pretrial order.[30] Indeed, in the pretrial order, the defendants frame the issue regarding Section 3.3 as being whether Mookerji satisfied certain "conditions precedent" for receiving incentive payments, not whether the parties labored under any mutual misconception while

---

affirm a judgment if it is correct for any reason, even if that reason is different than the reason upon which the trial court relied." *City Of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002).

[30] While relevant only to Mookerji's cross-appeal, we note that the defendants also never raised a mutual-mistake argument in their motion for summary judgment. There is, then, nothing in the record showing that this argument was ever brought to the trial court's attention.

18

drafting the document.[31] Needless to say, this Court will not "address arguments raised for the first time on appeal."[32]

2. Next, the defendants argue that the trial court erred in finding that Mookerji is entitled to a Tesla of his choosing under Section 3.4 of the employment agreement. Again, we disagree.

Section 3.4. of the employment agreement provides:

Additional Performance Incentive. If Tower Arch Capital, L.P. and its affiliates receive equity returns in excess of 3.0x invested capital into [SPI Holdco], [SPI Holdco] shall promptly deliver to Executive a Tesla automobile of Executive's choosing, fully paid for and free and clear of all encumbrances.

---

[31] *See Fox v. Washburn*, 264 Ga. 617, 618 (1) (449 SE2d 513) (1994) ("Mutual mistake, in relation to reformation, means a mistake shared by, or participated in by, both parties, or a mistake common to both parties, or reciprocal to both parties; both must have labored under the same misconception in respect of the terms and conditions of a written instrument . . . ." (punctuation omitted)); *Ledford v. Smith*, 274 Ga. App. 714, 727 (4) (618 SE2d 627) (2005) ("A mutual mistake is one in which both parties participate by each laboring under the same misconception." (punctuation omitted)).

[32] *Paden v. Rudd*, 294 Ga. App. 603, 606 (2) (669 SE2d 548) (2008) (punctuation omitted); *see Extremity Healthcare, Inc. v. Access To Care Am., LLC*, 339 Ga. App. 246, 258 (3) (793 SE2d 529) (2016) ("We do not consider issues raised for the first time on appeal, because the trial court has not had opportunity to consider them." (punctuation omitted)).

At trial, Mookerji testified that Tower Arch invested "$26,708,103 and a few cents" in SPI Holdco, and it ultimately received more than $90 million from its deal with SPI Holdco. In doing so, Mookerji refreshed his recollection with a 2015 "waterfall document," which lists "the sources of funds and use of funds when the Tower Arch transaction was done in May of 2015." Mookerji also entered into evidence a 2018 "waterfall document," which showed that Tower Arch and its affiliates received distributions of over $90 million upon the sale of SPI Holdco, which is more than three times their approximately $27 million investment. Based on this testimony, the trial court found that Mookerji was entitled to receive a Tesla under Section 3.4. And while the court acknowledged that Topham testified otherwise, it found the weight of the evidence established that the requirements of Section 3.4 were satisfied.

The defendants now argue the trial court erred in this regard because it "ignored" testimony from Topham that Tower Arch and its affiliates did not receive equity returns in excess of three times their invested capital. At trial, Topham testified that Mookerji's testimony only reflected Tower Arch's *initial* invested capital, and their total overall investment was approximately $32 or $33 million. Topham testified that while it was "close," Tower Arch and its affiliates did not receive revenue in

excess of three times their capital investment. But unlike Mookerji, the defendants did not rely on or submit any documentary evidence to support Topham's testimony.

In essence, the defendants contend that we should disregard the trial court's determination that Mookerji's testimony was more credible than Topham's testimony. But contrary to the defendants' contention, the trial court did not "ignore" Topham's testimony. Indeed, the court acknowledged Topham and Mookerji's conflicting testimony, as well as the documents used to support Mookerji's testimony, and concluded the weight of the evidence established that the requirements of Section 3.4 were satisfied. And while the defendants appear to suggest that the trial court was somehow *required* to credit Topham's unsupported testimony over Mookerji's testimony and his supporting documents, we have already explained that in reviewing a bench trial, we "view the evidence in the light most favorable to the trial court's rulings, *defer to the trial court's credibility judgments*, and will not set aside the trial court's factual findings unless they are clearly erroneous."[33] Again, the trial court is the trier of fact in a bench trial, and its findings "will be upheld on appeal if there is

---

[33] *Sitterli*, 344 Ga. App. at 671 (punctuation omitted and emphasis supplied); *accord Gibson*, 301 Ga. at 624.

21

any evidence to support them."[34] As a result, the trial court was entitled to credit Mookerji's testimony, and we are not at liberty to set aside that factual finding.

*Case No. A21A0923 - Summary Judgment*

In his cross-appeal, Mookerji argues that the trial court erred by denying his motion for summary judgment as to his claim that he is entitled to a lump-sum $1,000,000 severance payment under Section 8.1 (c) of his employment agreement, and instead, granting summary judgment to the defendants as to that claim. He also contends that the trial court erred in denying his motion to amend the pretrial order.

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[35] Furthermore, a *de novo* standard of review "applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[36] Moreover, at the

---

[34] *Manigo v. Johnson*, 241 Ga. App. 676, 676 (527 SE2d 282) (1999) (punctuation omitted); *see Bloomfield*, 282 Ga. at 108 (1) ("[T]he standard by which findings of fact are reviewed is the 'any evidence' rule, under which a finding by the trial court supported by any evidence must be upheld." (punctuation omitted)).

[35] OCGA § 9-11-56 (c); *accord Martin*, 316 Ga. App. at 697.

[36] *Martin*, 316 Ga. App. at 697 (punctuation omitted).

22

summary-judgment stage, "[w]e do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution."[37] With these guiding principles in mind, we will address Mookerji's specific claims of error.[38]

1. In his first two claims of error, Mookerji argues that the trial court erred in denying his motion for summary judgment and granting the defendants' motion for same as to his claim that he is entitled to a $1,000,000 severance payment under Section 8.1 (c) of the May 2015 employment agreement. We disagree.

On the same day Mookerji signed the employment agreement in May 2015, he also signed SPI Holdco's 2015 operating agreement, portions of which are incorporated into several of the employment agreement's provisions. Relevant here, Section 8 of the employment agreement provides:

8. *Obligations of Company Upon Termination*:

8.1 Termination by [SPI Holdco] for a Reason Other than Cause and Termination by Executive for Good Reason. Executive's

---

[37] *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

[38] Although we view the evidence in the light most favorable to Mookerji as the nonmovant at the summary-judgment stage, our resolution of this claim of error only involves contract construction, which again, is a question of law for the Court to decide. *See supra* note 9 & accompanying text.

employment with [SPI Holdco] and SPIG may be terminated only in accordance with Section 8.15 of [SPI Holdco's] Operating Agreement. If Executive's employment is terminated (y) by [SPI Holdco] for any reason other than Cause or (z) by Executive for Good Reason:

. . .

> (c) *When and as required by Section 8.15 of the Company Operating agreement*, and in accordance with the requirements of such provision, [SPI Holdco] shall pay Executive the "Without Cause Separation Payment" (as defined in the Company Operating agreement), *which shall be in the amount of One Million Dollars ($1,000,000)* before deducting all applicable withholdings, and which amount shall be payable to Executive in a lump sum.[39]

And Section 8.15 (c) of the 2015 operating agreement provides:

Separation Payment Following Without Cause Removal Prior to Third Anniversary. Unless [Mookerji] otherwise agrees to accept a role as a member of [SPI Holdco's] senior management team and continue on following such removal as an employee of SPIG, if [Mookerji] is actually removed by the Board from his roles in accordance with Section 8.15 (b) without Cause during the time period commencing on the next day following the eighteen (18) month anniversary of the date hereof

---

[39] (Emphasis supplied).

and ending on the three year anniversary of the date hereof, and, [SPI Holdco] shall pay, or cause to be paid, within fifteen (15) Business Days following the later to occur of (i) the delivery of a removal notice pursuant to clause (iii) of Section 8.15 (b), and (ii) the date of the expiration of the revocation period of a release of claims which [Mookerji] executes and delivers to [SPI Holdco], on [SPI Holdco's] standard and customary reasonable form of release of claims regularly obtained from individuals leaving the employment of [SPI Holdco], a separation payment equal to one million dollars (the "Without Cause Separation Payment") . . . .

It is undisputed that on May 23, 2016, one year after the parties entered into the employment agreement and the 2015 operating agreement, they amended the latter by entering into SPI Holdco's Second Amended and Restated Operating agreement. (the "2016 amended operating agreement"). And at the outset of the 2016 amended operating agreement, it provides that "in consideration of the promises and covenants contained herein, the parties hereto agree to amend and restate the Original Operating agreement *in its entirety*."[40] Significantly, in this amended agreement, the entirety of Section 8.15 of the 2015 operating agreement was removed.[41]

---

[40] (Emphasis supplied).

[41] To be clear, while the 2016 amended operating agreement does include a "Section 8.15," it is a one-sentence provision wholly unrelated to the instant dispute. But the *substance* of Section 8.15 in the 2015 operating agreement regarding the

25

In denying Mookerji's motion for summary judgment, the trial court found that several genuine issues of material fact remained as to whether he satisfied the prerequisites in Section 8.15 of the 2015 operating agreement, including, *inter alia*, a requirement that he execute and deliver a release of claims to SPI Holdco. Nevertheless, the trial court granted the defendants' motion for summary judgment as to this claim, finding that because the 2016 amended operating agreement replaced the original agreement in its entirety, Mookerji was not entitled to the severance provided for in the outdated and *superseded* 2015 operating agreement. Importantly, Mookerji signed and executed the 2016 amended operating agreement in his personal capacity *and* as CEO of SPIG.

On appeal, Mookerji argues, as he did below, that the employment agreement unambiguously incorporates the 2015 operating agreement, and thus, the 2016 amended operating agreement did not amend Section 3.4 of the employment agreement such that he was no longer entitled to the severance payment. And in support, he primarily focuses on the following language in Section 3.3 of the employment agreement: "For purposes of the foregoing, 'Adjusted EBITDA' and 'Agent presentation' shall have the meanings assigned to such terms in [SPI

severance payment was entirely removed.

Holdco's] Amended and Restated Operating Agreement of *even date herewith* ('Company Operating agreement')."[42] Mookerji contends that—because the 2015 operating agreement was the only one executed on the same day as the employment agreement—the phrase "of even date herewith" means that Section 8.1 (c) still incorporates Section 8.15 of the initial 2015 operating agreement, even though the latter was superseded by the 2016 amended operating agreement.

In addressing this argument, the trial court first found that the phrase "even the date herewith" in Section 3.3 of the employment agreement creates an ambiguity as to whether that agreement still incorporates the initial 2015 operating agreement. Nevertheless, the trial court found that the ambiguity could be "resolved by basic contract construction." Indeed, Section 8.1 (c) of the employment agreement states that Mookerji is entitled to the $1,000,000 severance payment *"[w]hen and as required by Section 8.15 of the Company Operating agreement*, and in accordance with the requirements of such provision."[43] But by the time Mookerji was terminated, the language of Section 8.15 of the 2015 operating agreement had been superseded

---

[42] (Emphasis supplied).

[43] (Emphasis supplied).

27

by a later agreement, *with his consent*, and thus the operating agreement no longer "required" a severance payment under any circumstances.

Furthermore, while the 2016 operating agreement omitted the severance-payment provision, it restated and included many of the provisions of the original agreement. Suffice it to say, this is strong evidence of the parties' intent to eliminate the severance-payment requirement.[44] Thus, even though the employment agreement was not itself amended, by the time Mookerji's employment was terminated, there was simply no enforceable severance-payment requirement under Section 8.1 (c) of

[44] *See Monumedia II, LLC v. Dep't of Transp.*, 343 Ga. App. 49, 58 (806 SE2d 215) (2017) (noting the "longstanding tenets of statutory construction: "expressio unius est exclusio alterius (expression of one thing implies exclusion of another) and expressum facit cessare tacitum (if some things are expressly mentioned, the inference is stronger that those not mentioned were intended to be excluded")); *Lunceford v. Peachtree Cas. Ins. Co.*, 230 Ga. App. 4, 5 (1) (495 SE2d 88) (1997) ("[T]he failure to use this language or to specifically reference punitive damages in the definitions section does not prevent coverage. Had [the insurance company] wished not to cover or to exclude punitive damages, it could have done so clearly and specifically. It did not, and consequently it is bound by the broad language of the policy."). *Cf. Alexander Props. Group, Inc. v. Doe*, 280 Ga. 306, 309 (1) (626 SE2d 497) (2006) (holding, in the context of statutory construction, that based on the principles of expressum facit cessare tacitum and expressio unius est exclusio alterius, the list of actions in a statute is presumed to exclude actions not specifically listed."); *Hammock v. State*, 277 Ga. 612, 615 (3) (592 SE2d 415) (2004) (holding, in the context of statutory construction, that because one subsection of statute expressly excluded application of defense of habitation between members of the same family, other sections that did not contain such limiting language shows the General Assembly's allowance of such defense).

the employment agreement. As a result, the trial court did not err in granting partial summary judgment to the defendants as to his severance-payment claim.

2. Lastly, Mookerji argues that the trial court abused its discretion in denying his motion to amend the pretrial order to add a breach-of-contract claim, seeking 30 days' salary based on SPI Holdco's failure to give him the requisite 30-day notice prior to his termination. But any potential error in this regard was harmless.

On March 9, 2019, the trial court entered the consolidated pretrial order, which was submitted jointly by the parties and did not include a breach-of-contract claim for 30 days' salary. Shortly thereafter, Mookerji filed a motion to amend the pretrial order to add such a claim. Importantly, as to this claim, Mookerji specifically requested damages in the amount of $38,059.83. And while the defendants initially consented to Mookerji's motion, it is undisputed that, prior to trial, they paid Mookerji the exact amount of salary he requested in his motion. As a result, at the outset of trial, the trial court denied Mookerji's motion to amend the pretrial order, explaining later, it its written order, that the defendants had cured the alleged breach by making the requested payment.

On appeal, Mookerji acknowledges that the defendants made the payment, but claims that they did so unilaterally, without negotiating with him, only to avoid

liability for attorney fees under OCGA § 13-6-11.[45] But he fails to explain how the defendants' *reason* for paying him the exact amount of damages he sought matters for purposes of deciding whether the claim was ultimately satisfied. And although Mookerji emphasizes that the defendants did not negotiate the amount of the payment with him, the trial court found and the record shows that $38,059.83 was the full amount of damages Mookerji sought as to the claim he wanted to add. Thus, any potential error the trial court may or may not have made in denying his motion to amend the pretrial order was harmless. And it is well settled that "an appellant must show harm as well as error to prevail on appeal."[46]

---

[45] OCGA § 13-6-11 provides: "The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." On appeal, Mookerji does not argue that he is entitled to attorney fees under OCGA § 13-6-11, only that such fees were the *reason* the defendants paid him to satisfy this claim.

[46] *Hall v. Ga. Dep't of Transp.*, 269 Ga. App. 546, 547 (604 SE2d 622) (2004); *see Hertz Corp. v. McCray*, 198 Ga. App. 484, 486 (2) (402 SE2d 298) (1991) ("[A] case will not be reversed merely because error may have occurred. Appellant is required to show harm as well as error to prevail on appeal.").

For all these reasons, we affirm the trial court's final judgment in Case No. A21A0922, as well as its summary-judgment order in Case No. A21A0923.

*Judgments affirmed. Mercier and Pinson, JJ., concur.*